# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

AUDRIAN TASTAN,

      Plaintiff,

v.                                No. 1:17-cv-00664-JCH-SCY

LOS ALAMOS NATIONAL
SECURITY, LLC.

      Defendant.

## MEMORANDUM OPINION AND ORDER

From 2003 to 2017, Ms. Audrian Tastan worked as an administrative specialist at Los Alamos National Laboratory. She brought this action against Los Alamos National Security LLC. ("LANS"),[1] claiming that it discriminated and retaliated against her based on her disability in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*., by failing to reasonably accommodate her epilepsy disorder, retaliating against her for seeking reasonable accommodations, and then firing her because of her disability. LANS moved under Fed. R. Civ. P. 12(c) to dismiss allegations in Ms. Tastan's Amended Complaint ("Am. Compl.," ECF No. 4) concerning a hostile work environment. *See* Def.'s 12(c) Mot., ("MTD"), ECF No. 33. LANS then moved for summary judgment. *See* Def.'s Mot. for Summ. J., ("MSJ"), ECF No. 57. Invoking the familiar *McDonnell Douglas*[2] burden-shifting framework, LANS argues in its motion for summary judgment that Ms. Tastan cannot establish a prima facie case of either discrimination or retaliation

---

[1] LANS manages and operates Los Alamos National Laboratory under a contract with the National Nuclear Security Administration of the United States Department of Energy. *See* Def.'s Mot. for Summ. J. at n.1 & 1. Both parties agree that LANS is a covered employer within the meaning of the ADA.

[2] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

under the ADA, and that even if she could, LANS legitimately terminated her for allegedly using false pretenses to obtain confidential security clearance information about her brother.

The Court awards summary judgment to LANS. LANS proffered a nondiscriminatory, non-retaliatory reason for Ms. Tastan's termination and Ms. Tastan failed to show that reason was pretextual.

## I.     FACTUAL BACKGROUND

The following material facts are stipulated to: Ms. Tastan was diagnosed with epilepsy as a child and has experienced seizures at times during her childhood and adulthood. Def.'s MSJ, Undisputed Fact ("UF") ¶ 15. On February 21, 2017, Ms. Tastan resigned from LANS in lieu of termination. UF ¶ 1. At the time of her resignation, Ms. Tastan was employed as an administrative assistant in LANS' SAFE-IP (Information Protection) group. UF ¶ 2. Due to the nature of the work and the classified information they have access to daily, employees in LANS' SAFE-IP group are held to the highest standards of honesty and truthfulness. UF ¶ 3. While employed in LANS' SAFE-IP group, Tastan was required to hold, and did hold, a "Q" level security clearance from the Department of Energy. UF ¶ 4.

The following additional disputed material facts, construed in the light most favorable to Ms. Tastan as the nonmoving party, show the following. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 961 (10th Cir. 2017).

### a. 2008 Seizure

In 2008, Ms. Tastan experienced a seizure while working. Deposition of Audrian Gásca Tastan 116:25, Pl.'s Resp. Br., Ex. A, ECF No. 61-1 ("Tastan Dep."). According to Ms. Tastan, in response to her seizure LANS placed her on a "fitness for duty under the false presumption that [she] was unable to work because [she] had [three] seizures." Affidavit of Audrian Tastan ¶ 9, ECF

No. 61-1 ("Tastan Aff."). In response, LANS' Occupational Medical Division placed various temporary work restrictions on Ms. Tastan's employment, including restricting her access to classified material and prohibiting her from driving while on official business. *See* Memorandum re: Clarification on Escort Status, Pl's Ex. I, ECF No. 61-1.

### b. Ms. Tastan's History of Reassignment or Schedule Change Requests

In 2014, shortly after Ms. Tastan had been assigned to work in the Weapons Division at the Laboratory, she had a seizure at work. Tastan Dep. 68:15-17. In April 2014, Ms. Tastan reported to Ms. Patty Blount, who was either a staff operations manager or chief-of-staff, of "difficulty in personalities" with Ms. Tastan's direct manager, Ms. Kelly Martinez, who caused her undue stress, hardship, and created a hostile environment, prompting Ms. Tastan to request a reassignment to a different unit within the Weapons Division with a less intense workload. *Id*. 68:15-22; Tastan Dep. 242:19-25 – 243:1-4, ECF No. 57-1. Another employee, Mr. Jay Carnes, denied Ms. Tastan's request. *Id*. 214:1-2.

According to Ms. Tastan's affidavit, in December 2014, she suffered another seizure. Tastan Aff. ¶ 10. In February 2015, Ms. Tastan requested to be reassigned, informing her managers that she was working in a stressful and hostile work environment. *Id*. In March 2015, Ms. Tastan suffered another seizure at work. *Id*. She told her manager, Manny Garcia, that the group she was working in was affecting her health, and requested a reassignment. *Id*.

Sometime in 2015, Ms. Tastan requested a schedule change so that she could take her youngest child to school later in the morning. UF ¶ 19. At first her managers did not approve her request, prompting Ms. Tastan to complain with LANS' Ombuds Office, which eventually sided with Ms. Tastan. Tastan. Dep. 142:12-16; 144:4-5. After the Ombuds Office's decision, Ms. Elaine Rodriguez, Acting Staff Operations Manager, approved Ms. Tastan's request to alter her schedule

from a 40-hour week to a 34-hour week, but required Ms. Tastan to sign a memorandum of understanding ("MOU"). *See* E-mail from Elaine Rodriquez to Audrey Tastan (Sept. 15, 2015); MOU, Def.'s Ex. D, ECF No. 57-4 at 1-2.

Both parties agree that this schedule change request was not based on accommodating Ms. Tastan's epilepsy. UF ¶ 20. According to Ms. Tastan, however, two other secretaries with equivalent jobs requested deviated work schedules but were not required to sign memoranda. Tastan Dep. 150:3-14. Making her sign the MOU was a sign that she was being treated unfairly for reporting to the Ombuds Office and "because of the fact that [she] was getting sick," and that her disability was "acting up." *Id*. 144:11-18. Believing that her schedule change request generated tension and animosity between her and her mangers, Ms. Tastan went back to her regular schedule after only two-weeks of being on the abbreviated schedule. Tastan Dep. 159:1-7; 249:11-16. Moreover, Ms. Tastan testified that shortly after she made her report to the Ombuds Office, managers gave Ms. Tastan a bad performance review. *Id*. 76:20-25 – 77:1-3. In one performance review, which is not in the record but was discussed by the parties at deposition, Ms. Tastan indicated that she asked Ms. Rodriquez to provide specific examples of the negative comments and that Ms. Rodriquez did not provide any such examples. *Id*. 180:13-25 -181:1-6.

In April 2016, Ms. Tastan suffered another seizure at work. Tastan Aff. ¶ 10. That same day, Ms. Tastan told her supervisor's supervisor, Ms. Elizabeth Hogan, that she needed to be reassigned to a different department. *Id*. By May 2016, Ms. Tastan was actively looking for a job reassignment within LANS. For instance, she sent an email to Ms. Hogan that she wished to be reassigned from the Weapons Division because she could not "deal with the poor management personalities and the stressful work environment." Email from Audrey Tastan to Elizabeth Hogan (date not imprinted), Def.'s Ex. F., ECF No. 57-6; Tastan Dep. 221:14-20. By the end of May

2016, LANS approved Ms. Tastan's assignment from the Weapons Division to the SAFE-IP group. Email from Audrey Tastan to w-11@lanl.gov (May 31, 2016), Def.'s Ex. G, ECF No. 57-7.[3] Despite being reassigned, Ms. Rodriguez later ignored Ms. Tastan's request to secure office space for a SAFE-IP employee, and one day Ms. Rodriquez asked Ms. Tastan if Ms. Tastan had a problem with Rodriquez. Tastan Dep. 73:21-25 – 74:1-16.

In November 2016 Ms. Tastan says she suffered another seizure, although she presented no evidence that LANS was aware of that seizure or that she requested an accommodation based on that seizure. *Id*. 10:2-4.

### c. Human Resources Investigation of Ms. Tastan and Termination Decision

In December 2016, about six or seven months after Ms. Tastan switched to the SAFE-IP group, Mr. David Rudolph, a Human Resources-Employee Relations ("HR") investigator, opened a fact-finding investigation concerning allegations that Ms. Tastan used false pretenses to obtain security clearance about her brother, Jacob Gasca. Declaration of David Rudolph, ECF No. 57-3 at 1 ¶¶ 1-5 ("Rudolph Decl."); Mr. Rudolph's Report, ECF No. 57-3 at 2 ("Rudolph Report"). Mr. Rudolph's investigation included multiple witness interviews and allowed Ms. Tastan to provide her account of events. UF ¶ 8.

---

[3] In her statement of disputed and additional facts, Ms. Tastan contends that LANS initially denied her May 2016 request for a reassignment from the Weapons Division. *See* Pl.'s Resp. Br., ECF No. 61 ¶ 23. However, Ms. Tastan supports this assertion by relying on the hearsay statement of Ms. Tastan's former colleague, Ms. Elizabeth Hogan. Ms. Hogan stated in an unsworn letter that she advocated for Ms. Tastan's reassignment "based on … [Ms. Tastan's] health and wellbeing," and that LANS denied the reassignment "even though options existed." *Id*. ECF No. 61-1, Ex. G. The Court disregards Ms. Hogan's unsworn statement given that LANS properly objected to its contents as hearsay. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("[W]e are constrained to disregard ... hearsay on summary judgment when, as here, there is a proper objection to its use and the proponent of the testimony can direct us to no applicable exception to the hearsay rule.").

According to Mr. Rudolph's report, on December 8, 2016, Ms. Tastan went to LANS' Clearance Processing office and asked two employees, Ms. Christine Unzueta and Ms. Lecole Trujillo, why Jacob Gasca's security clearance had been taken away without disclosing that Mr. Gasca was her brother. Rudolph Report at 2.[4] Ms. Tastan admitted to Mr. Rudolph and during a deposition that she did not disclose that Mr. Gasca was her brother. *Id.* at 3; Tastan Dep. 30:9-12. Mr. Gasca was a contract worker who lost his job with LANS after his security clearance was terminated. Rudolph Report at 9. Because Ms. Tastan did not want "there to be an issue with [] asking about his clearance," she told Ms. Trujillo and Ms. Unzueta that Gasca was a contractor. Tastan Dep. 30:2-3; 18. And since Mr. Gasca technically was a contract worker, Ms. Tastan testified that she did not believe she was hiding any information concerning Mr. Gasca or being deceitful, so she "just didn't go into detail and provide who he was and what [her] relation to him was." *Id.* 30:15-20. Moreover, LANS has no policy against asking about another person's security clearance. Tastan Aff. ¶ 5.

Based on various witnesses' statements, including Ms. Tastan's, HR concluded that Ms. Tastan "engaged in dishonest and deceptive behavior" and misrepresented her role and reason for asking for Mr. Gasca's security clearance information. Rudolph Report at 3. HR credited Ms. Unzueta's and Ms. Trujillo's rendering of events over that of Ms. Tastan's. *Id.* After considering the following five aggravating factors – (i) Ms. Tastan's position as an Administartive Assistant in the SAFE-IP; (ii) her security clearance level; (iii) the finding of dishonest and deceptive behavior; (iv) the nature of the information she has access to as part of her job; (v) and the fact that

---

[4] The Court references the page numbers imprinted by the Court's Electronic Case Filing system. Accordingly, the Rudolph Report spans from ECF No. 57-3 pp. 2-18 (cited by LANS as "LANS.TASTAN.0000019 – LANS.TASTAN.0000022 and LANS.TASTAN.0000026 – LANS.TASTAN.0000038).

she received a written counseling in 2008 for dishonest behavior – HR determined that the terminating Ms. Tastan for cause was in order. *Id*. at 4. Mr. Rudolph stated in his sworn declaration that he had no knowledge of Ms. Tastan's health conditions when he conducted his investigation. Rudolph Decl. ¶ 5.

A Case Review Board ("CRB") reviewed Mr. Rudolph's report and also recommended discipline. LANS' Letter of Acceptance of Resignation, Def.'s Ex. B, ECF No. 57-2 at 3. David Telles, Division Leader for the SAFE Division where the SAFE-IP group is housed, accepted Ms. Tastan's resignation in lieu of termination based on Mr. Rudolph's report and the CRB's recommendation. Declaration of David Telles, ECF No. 57-2 ¶¶ 2, 3, 7, 9 ("Telles Decl."). Like Mr. Rudolph, Mr. Telles stated in his declaration that when he terminated Ms. Tastan, he knew of no health conditions and that his decision was based solely on the HR investigation. *Id*. at ¶ 10.[5]

## II.     DISCUSSION

LANS first argues in its Rule 12(c) motion that Ms. Tastan's allegations in her amended complaint concerning a "hostile work environment" exceed the scope of the allegations raised in her Equal Employment Opportunity Commission ("EEOC") charge that she filed on March 28, 2017, about a month after her termination from LANS. Because LANS believes that "exhaustion

---

[5] In her response brief to LANS' motion for summary judgment, Ms. Tastan attempts to raise a fact issue concerning Mr. Telles' sworn statement that he was unaware of any of Ms. Tastan's health condition by arguing that HR knew of Ms. Tastan's "seizures and her trips to the emergency room resulting for [sic] seizures at work." Pl.'s Resp. Br. ¶ 14. However, the record cited by Tastan does not support this assertion. In the cited portions, Ms. Tastan simply described the day she was terminated. Nowhere is there any mention that Mr. Telles or HR were aware of her seizures and trips to the emergency room. Ms. Tastan's final citation to "Def.'s Motion, p. 2, para. 9," is a non-existent citation which the Court disregards. *See Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008) ("When a party's brief fails to provide citations in support of its factual assertions, we are left to scan volumes aimlessly for asserted facts. But reading a record should not be like a game of Where's Waldo? … And it is within our power as a court to refuse to consider an argument in these circumstances.").

of remedies is a jurisdictional perquisite to filing a suit under the ADA," [6] *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007), LANS contends that the Court lacks subject matter jurisdiction over Ms. Tastan's claims concerning a hostile work environment. LANS additionally contends that Ms. Tastan's allegations that her stressful work environment caused her more seizures is a type of injury exclusively covered by New Mexico's Worker's Compensation Act, N.M. Stat. Ann. §§ 52-1-1 *et seq.*

As for its motion for summary judgment, LANS argues that Ms. Tastan cannot establish a prima facie case of discrimination. First, LANS contends that without expert medical testimony, there is insufficient evidence that Ms. Tastan suffered from a disability protected by the ADA. LANS does not dispute that Ms. Tastan has epilepsy. Rather, LANS maintains that a mere diagnosis of epilepsy and history of seizures in and of themselves establish, as a matter of law, that Ms. Tastan was substantially impaired in major life activities. LANS therefore argues that Ms. Tastan is not covered by ADA because she failed to present evidence that she has an ADA protected disability. LANS additionally argues that Ms. Tastan is unqualified, with or without a reasonable accommodation, to perform the essential functions of the job of administrative assistant. Next, LANS argues that even if Ms. Tastan was disabled, no reasonable factfinder could conclude that LANS terminated her based on her disability because HR investigators were unaware

---

[6] At the time LANS filed its motion to dismiss in 2018, this was an accurate statement of the law. However, in August 2018, the Court of Appeals for the Tenth Circuit abolished Circuit precedent that a plaintiff's failure to exhaust administrative remedies deprives a federal over claims not alleged in an EEOC charge. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018). The court instead held that such a failure "merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." *Id*. at 1185. This alteration in Tenth Circuit precedent has no impact on this case. Here, LANS already pleaded failure to exhaust remedies in its Answer. *See* Def.'s Answer, ECF No. 13 at 7.

of her epilepsy; her November 2016 seizure was unconnected to LANS' investigation and eventual termination of Ms. Tastan in February 2017; and her requests for a deviated work schedule and reassignment from the Weapons Division were not based on her disability.

Aside from her discrimination claim, LANS likewise contends that Ms. Tastan cannot establish a prima facie case for retaliation under the ADA because no reasonable factfinder could conclude that Ms. Tastan asked LANS for a special accommodation based on her disability or that any purported protected activity was causally linked to her termination, both of which are necessary elements to establish a prima facie case of ADA retaliation.

Finally, LANS argues that, even if Ms. Tastan could establish a prima facie case for either discrimination or retaliation, LANS proffered a legitimate, nondiscriminatory reason for Ms. Tastan's firing – namely, Ms. Tastan allegedly used false pretenses to obtain security clearance information about her brother – and that Ms. Tastan failed to carry her burden of production to show that LANS' proffered nondiscriminatory reason is pretextual.[7]

In analyzing a motion for summary judgment, the Court views the evidentiary record in the light most favorable to Ms. Tastan and draws reasonable inferences in her favor. *See DePaula*, 859 F.3d at 968. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In analyzing a motion for judgment on the pleadings under Rule 12(c), the Court applies the same standard of review that applies to Rule 12(b)(6) dismissals. *See Sanchez v. United*

---

[7] LANS additionally seeks summary judgment on an affirmative defense that it raised in its Answer: that Ms. Tastan failed to mitigate her damages by failing to diligently pursue post-termination employment. Because the Court grants LANS summary judgment, the Court need not reach this argument.

*States Dep't of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017). A 12(b)(6) motion should be granted for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

**A. Scope of EEOC Charge**

Under the ADA, a plaintiff must exhaust her administrative remedies before filing suit. *See Jones*, 502 F.3d at 1183. "The exhaustion rule derives from two principal purposes: 1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC an opportunity to conciliate the claim[.]" *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164–65 (10th Cir. 2018) (citations and internal quotations omitted). "The EEOC, in turn, has set up a system by which a person will submit information to the agency, typically in the form of an intake questionnaire, and then the EEOC will render assistance in the filing of the charge." *Jones v. Needham*, 856 F.3d 1284, 1289–90 (10th Cir. 2017) (citing 29 C.F.R. § 1601.6(a)). "The resulting charge document should contain a 'clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices.'" *Id.* (citing § 1601.12(a)(3)). "[A]fter a plaintiff receives a notice of her right to sue from the EEOC, that plaintiff's claim in court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Smith*, 904 F.3d at 1164 (citations and quotation marks omitted). "The ultimate question is whether the conduct alleged [in the lawsuit] would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made [in the EEOC charge]." *Id.* at 1164-1165 (citations and quotation marks omitted).

Hostile work environment claims are actionable under the ADA. *See Lanman v. Johnson Cnty., Kan.*, 393 F.3d 1151, 1155 (10th Cir. 2004). "To exhaust a hostile work environment claim, a claimant's charge must describe a "workplace ... permeated with discriminatory intimidation,

ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment[.]'" *Hartwell v. Sw. Cheese Co., LLC*, 276 F. Supp. 3d 1188, 1203 (D.N.M. 2016) (Parker, J.) (quoting *Hunt v. Riverside Transp., Inc.*, 539 Fed. Appx. 856, 859 (10th Cir. 2013) and *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

On March 28, 2017, roughly one month after Ms. Tastan resigned from LANS in lieu of termination, she filed her EEOC Charge. On her EEOC intake questionnaire, Ms. Tastan checked boxes indicating that her claims were based on "retaliation," and "disability." She identified the dates of discrimination from April 1, 2014 to February 21, 2017. The narrative portion of her EEOC charge states in full:

> I was hired in March 2001, as an Administrative Specialist and my last position held was Administrative Specialist IV. In April 2014, I requested a reasonable accommodation for a work reassignment, but was denied.
>
> In August 2016, I sought assistance from the Ombudsman to obtain a reasonable accommodation.
>
> In September 2016, I requested a reasonable accommodation for a change of schedule and I was subjected to different terms and conditions in order to receive this accommodation. I was also harassed through constant monitoring and harsher treatment.
>
> In December 2016, I was subjected to an investigation regarding checking on the status of my brothers [sic] Department of Energy clearance request. I was informed on February 21, 2017 that I would be terminated for cause for this incident and a counseling that occurred in 2008. Other co-workers were not terminated for similar conduct. I resigned in lieu of termination for cause.
>
> I believe I have been discriminated against because of disability, and retaliated against for engaging in protected activity, in violation of [the ADA].

EEOC Charge, Def.'s 12(c) Mot., Ex. A.

In Ms. Tastan's amended complaint, she did not actually assert a cause of action for hostile work environment work environment based on disability. Rather, her two-count complaint asserts claims for relief for discrimination and retaliation under the ADA. Nevertheless, LANS argues

that Ms. Tastan's allegations in her complaint concerning a "hostile work environment" exceed the scope of the allegations raised in her EEOC charge because, unlike Ms. Tastan's amended complaint, the EEOC charge did not mention that Ms. Tastan was epileptic, allege that a hostile work environment exacerbated that disability, or detail that Ms. Tastan reported to LANS about the hostile work environment. In support of its motion, LANS relies on the Court's decision in *Hartwell v. Sw. Cheese Co., LLC*. In *Hartwell*, the Court found that the plaintiff's EEOC charge – consisting of an allegation that the defendant did not promote her and passed her over for a "younger, [w]hite [e]mployee," and that she was suspensed for having a tongue ring – would not lead an investigator to investigate claims of a hostile work environment. 276 F. Supp. 3d at 1204-05. As the Court explained, the plaintiff's charge simply contained no reference to or description of a hostile work environment, or even used words such as "hostile work environment," "harassment" or "abuse." *Id.* at 1203.

Here, although LANS is correct that Ms. Tastan's charge does not mention the words "hostile work environment," the charge does state that she was "subjected to different terms and conditions" and "harassed through constant monitoring and harsher treatment," after she made a request for an accommodation. While Ms. Tastan's charge does not explicitly say that she is epileptic, she wrote in the EEOC charge that she believed she was discriminated against because of her disability. Given that the Tenth Circuit has "stress[ed]" that EEOC charges like Ms. Tastan's are to be "liberally construed," because they are "traditionally filed by non-attorneys," *Smith*, 904 F.3d at 1166, the Court finds that the allegations in the amended complaint concerning a hostile work environment are within the scope of Ms. Tastan's EEOC charge.

However, the Court bears in mind that Ms. Tastan never asserted a claim for relief for hostile work environment based on disability in her amended complaint. Moreover, as the Court

explains below in its evaluation of the summary judgment record, the trier of fact could not conclude Ms. Tastan's evidence establishes that LANS' termination decision was pretextual. Thus, to the extent that Ms. Tastan asserts a claim for relief for hostile work environment based on disability, that claim fails for the reasons articulated in the pretext analysis of this Memorandum Opinion and Order.

### B. Claim for Discrimination

Because Ms. Tastan contends that LANS intentionally discriminated against her by terminating her because she was disabled, this lawsuit presents a claim of disparate treatment discrimination. *See Davidson v. Am. Online, Inc.,* 337 F.3d 1179, 1189 (10th Cir.2003). To establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate that she

> (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.

*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037–38 (10th Cir. 2011). "The plaintiff's burden at the prima facie stage requires only a small amount of proof necessary to create an inference of discrimination or retaliation, ... by a preponderance of the evidence[.]" *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (internal quotation marks and citations omitted).

Where, as here, "[i]f a plaintiff offers no direct evidence of discrimination, which is often the case, the court applies the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp.*" *C.R. England, Inc.*, 644 F.3d at 1038. If the plaintiff can establish a prima facie case of discrimination, then "the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged action." *Selenke v. Med. Imaging of Colorado*, 248

F.3d 1249, 1259 (10th Cir. 2001). "If the defendant articulates such a reason, then the plaintiff may prove that it is merely a pretext for unlawful discrimination on the basis of her disability." *Id.* "At all times, the plaintiff retains the ultimate burden of proving such discrimination." *Id.*

For purposes of deciding this motion for summary judgment, the Court assumes without deciding that Ms. Tastan can establish a prima facie case of discrimination. *See C.R. England, Inc*., 644 F.3d at 1043 (assuming without deciding that the plaintiff had established a prima facie discriminatory termination claim under the ADA). The Court proceeds directly to the pretext element of the *McDonnel Douglas* burden-shifting test. Applying that test, Ms. Tastan failed to rebut LANS' evidence that its termination decision was pretextual.

Pretext Analysis

After conducting an investigation involving multiple witnesses, LANS concluded that Ms. Tastan misrepresented her job role to obtain information about her brother's security clearance information. LANS offered evidence, including Mr. Rudolph's declaration and report, along with a declaration from Mr. Telles, Ms. Tastan's supervisor, who stated that LANS decided to terminate Ms. Tastan based on Mr. Rudolph's and the CRB's recommendations. In Mr. Rudolph's report, he stated that LANS "considers dishonest behavior as a termination offense and deceptive behavior is viewed as much worse," and concluded that HR's "only recommendation [was] termination for cause." Rudolph Report at 4. Similarly, Mr. Telles stated in a letter to Ms. Tastan that after reviewing Mr. Rudolph's report and considering the advice of the CRB, he found that Ms. Tastan's conduct was deceptive and that she misrepresented her role when asking about Mr. Gasca. LANS' stated reason is legitimate on its face. It thus satisfies LANS' "exceedingly light" burden to show that its reason was legitimate, thereby shifting the burden to Ms. Tastan to show that LANS' reason

is pretextual. *C.R. England*, 644 F.3d at 1043. As the Court will explain, Ms. Tastan has failed to show that reason was pretextual.

To show that am employer's articulated reason for taking an adverse employment action was pretextual, Ms. Tastan must demonstrate that the "proffered reason is factually false," or that "discrimination was a primary factor in the employer's decision." *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016). "This is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *DePaula*, 859 F.3d at 970-71 (internal quotation marks omitted).

Courts generally do not "second guess the business judgment of the employer." *Id.* (citations and quotations omitted). "Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Id.* (citations and quotations omitted). "In determining whether the proffered reason for a decision was pretextual, [courts] examine the facts as they appear *to the person making the decision*," and "do not look to the plaintiff's subjective evaluation of the situation." *C.R. England*, 644 F.3d at 1044 (citations and quotations omitted).

Here, Ms. Tastan argues that LANS' stated reason is pretextual because no policy prohibits asking about another's security clearance and because eleven other dishonest employees were not terminated. Next, Ms. Tastan claims that the timing of events suggests that LANS' termination was truly based on her disability. Namely, following her seizure in November 2016, HR investigated her in December, drug tested her in January 2017 (suggesting that it was looking for a way to fire her), and terminated her by February 2017. As further proof that LANS was "fishing"

for a way to fire her, Ms. Tastan points out that in Mr. Rudolph's HR investigation, LANS relied on a reprimand she received from 2008, even though LANS' policy is to not retain such employee reprimands after two-years. Ms. Tastan also points out that two other secretaries with equivalent jobs requested deviated work schedules but were not required to sign a memorandum of understanding, which Tastan believes is evidence of differential treatment.

Ms. Tastan additionally believes that a factfinder could conclude that Ms. Unzueta, one of the witnesses in the HR investigation, made incoherent and inconsistent statements. Specifically, Ms. Tastan points out that in Ms. Unzueta's interview with HR on January 17, 2017, Ms. Unzueta identified Jacob Gasca as Ms. Tastan's brother, suggesting that Ms. Unzueta in fact knew all along that Mr. Gasca and Ms. Tastan were siblings. Ms. Tastan additionally contends that Mr. Rudolph had full access to her employee file, and thus would have known while investigating her that she was epileptic.

Upon the review of the record, the Court concludes that Ms. Tastan has failed to provide evidence from which a reasonable jury could find that LANS' termination decision was pretextual. Ms. Tastan's argument that LANS acted on an unwritten policy is not evidence of pretext. *See C.R. England, Inc.*, 644 F.3d at 1044 ("[plaintiff] cites no controlling precedent that in any way supports the proposition that an employer's legitimate, nondiscriminatory justification must be based upon an official company rule or policy—much less be *required* by such a rule or policy— and we are not aware of any such precedent.") (emphasis in original). Ms. Tastan additionally attempts to create a fact dispute by casting doubt on whether LANS uniformly disciplined employees for misconduct involving honesty and truthfulness, citing differential treatment of eleven other employees. According to Ms. Tastan's testimony, a retired human resources employee told her that LANS disciplined, but did not terminate, eleven other employees for dishonest and

fraudulent behavior. However, Ms. Tastan provided no evidence of the other employees' infractions or LANS' response to those infractions. She provided no witness statements, no discipline records, and no indication that these employees even worked in the SAFE-IP group. She merely proffered her own testimony, which in turn relies on an out of court statement made by a retired employee. *See E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 989 (10th Cir. 2012) (rejecting plaintiff's argument "that other similarly situated employees engaged in the same behavior for which [e]mployee was reprimanded, but … [not] counseled" when the plaintiff provided no evidence of the other employees' infractions.). Even drawing reasonable inferences in Ms. Tastan's favor, a reasonable jury could not conclude that Ms. Tastan's evidence shows that LANS treated her differently from similarly situated employees by terminating her because of her disability.

As for the timing of Ms. Tastan's November 2016 seizure, Ms. Tastan pointed to no evidence whatsoever that her seizure occurred at the worksite or that LANS was even aware that she suffered a seizure. Meanwhile, LANS submitted in its reply brief Ms. Tastan's own medical report from November 28, 2016 in which Ms. Tastan reported to her medical provider that as of that date she "had one seizure over one year ago, but … that her seizures are very rare." Def.'s Reply Br., ECF No. 70-4, Ex. L 1. Moreover, even if the timing of her alleged November 2016 seizure and subsequent termination provides support for her claim, that evidence only establishes her prima facie case, which is insufficient to rebut LANS' nondiscriminatory reason for terminating her employment. *See Selenke*, 248 F.3d at 1260; *DePaula,* 859 F.3d at 976 ("[t]his court has refused to allow even very close temporal proximity to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext.").

Ms. Tastan's assertion that her January 2017 drug test was a way to "get rid of her" is belied by her own testimony that LANS drug tested her on four previous occasions between 2008 and 2013 and that these were nothing more than random drug tests. *See* Tastan Dep. 82:4-25 – 83:1-24. Finally, Ms. Tastan presented no evidence, other than her own subjective belief, that LANS singled her out by making her sign an MOU in 2015 or that this was based on her disability.

Many of Ms. Tastan's arguments and evidence of pretext centers on alleged weaknesses in the HR investigation that was the basis for the adverse employment decision, so the Court next analyzes those specific assertions. It is Ms. Tastan's burden to rebut LANS' assertion that her misconduct motivated LANS to terminate her employment. *See Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1239 (10th Cir. 2014) ("Although it is generally true that the moving party has the burden to show that there is no genuine issue of material fact on a motion for summary judgment, the same is not true in the context of an adverse employment decision. When an employment decision is made based on alleged misconduct, the plaintiff must present evidence that rebuts the defendant's claim that the misconduct was the motivating factor for the employment decision."). Ms. Tastan offers five reasons why she believes that the HR investigation contained enough weaknesses to raise an inference of pretext: (1) Ms. Unzueta and Ms. Trujillo made inconsistent statements; (2) Ms. Tastan honestly represented Mr. Gasca as a contractor and therefore was not deceptive; (3) LANS has no official policy of inquiring about another person's security clearance[8]; (4) Mr. Telles, the SAFE Division Leader who accepted Ms. Tastan's resignation in lieu of termination, merely "rubber stamped" Mr. Rudolph's biased conclusions; (5)

---

[8] The Court's analysis above disposes of this argument and the Court does not readdress this assertion.

Mr. Rudolph told Ms. Tastan he would interview Mr. Randy Drake, another manager and never did and yelled at Ms. Tastan, "you don't ask the questions we do."

"A failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." *See Smothers*, 740 F.3d at 542. Thus, in *Smothers* the Tenth Circuit concluded that the plaintiff's evidence that superiors did not solicit his side of the story before firing him and instead credited the "one-sided information," of an employee that the plaintiff quarreled with raised a jury question of whether the employer's investigation of the employee raised an inference of pretext. *Id*. By way of contrast, in the Tenth Circuit's case *Estate of Bassatt*, 775 F.3d at 1240, the court held that no reasonable jury could find that the employer's investigation into the plaintiff's misconduct raised an inference of pretext where the investigator interviewed "key witnesses," including the plaintiff. Here, Ms. Tastan's evidence concerning HR's investigation fails to draw an inference of pretext. LANS interviewed five key witnesses, including Ms. Tastan. It allowed her to tell her side of the story, distinguishing this case from *Smothers*.

Ms. Tastan claims that one of the witnesses, Ms. Unzueta, made inconsistent statements. Specifically, in her interview with Mr. Rudolph, Ms. Unzueta identified Jacob Gasca and Ms. Tastan as siblings, whereas Ms. Unzueta originally said that she did not know Ms. Tastan, much less her brother. However, Ms. Tastan herself stated: "I never told the ladies at Personnel Security that I was Jacob's sister." Rudolph Report at 10. Rather than showing pretext by revealing inconsistencies in the employer's proffered reason, Ms. Tastan's own statement is *consistent with* LANS' proffered reason for terminating her – namely, she did not disclose her brother's identity. Ms. Tastan therefore has not shown that LANS' stated justification is "unworthy of belief," *C.R. England, Inc.*, 644 F.3d at 1044, when the parties agree that Ms. Tastan did not disclose her

brother's identity when asking about his security clearance. *Cf. Foster*, 830 F.3d at 1194 (employer's "inconsistent reasons" for terminating plaintiff raised a jury question of pretext.). LANS' stated reason for terminating Ms. Tastan is the same reason it has given in this litigation, suggesting its reason was not pretextual. *See Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1319 (10th Cir. 2017) (employer's reasons for demoting plaintiff were the same reasons given in litigation of plaintiff's employment lawsuit, thereby "cut[ting] against a finding of pretext.") Moreover, HR's decision to credit Ms. Unzueta's and Ms. Trujillo's version of events over that of Ms. Tastan's does not demonstrate pretext. *See Estate of Bassatt*, 775 F.3d at 1240 (school principal's decision to credit another employee's version of events over the that of the plaintiff's does not suggest pretext.). HR credited those witnesses' version of events because their accounts were substantially similar.

Ms. Tastan's attempts to minimize her conduct by stating that she honestly represented Mr. Gasca as a contractor without disclosing her relation to him only establishes that her idea of what constitutes "deceptive behavior" contrasts with that of LANS' management. *See Selekne*, 248 F.3d at 1261. However, in analyzing whether an employer's adverse action is pretextual, "[courts] examine the facts as they appear *to the person making the decision*," and "not .. to the plaintiff's subjective evaluation of the situation." *C.R. England*, 644 F.3d at 1044 (emphases in original). LANS concluded in its investigation that "dishonest behavior" is "a termination offense" and that "deceptive behavior is viewed as much worse." Rudolph Report at 4. Ms. Tastan fails to provide evidence that LANS honestly believed anything other than that she acted deceptively. Given Ms. Tastan's failure to produce evidence to the contrary, the Court does not doubt LANS' business judgment. *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) ("In cases arising under the ADA, [courts] do not sit as a 'super personnel department' that second guesses

employers' business judgments."). Rather, the relevant inquiry is "whether [the employer] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). Because Ms. Tastan admitted that she did not disclose her brother's identity and because she failed to adduce evidence undercutting LANS' honest belief that her behavior warranted termination, no reasonable jury could conclude that LANS' termination decision was pretextual.

Ms. Tastan also believes that a jury could conclude that LANS' decision to dredge up an old reprimand that she received from 2008 as part of its termination decision evinces pretext. It is true that a plaintiff may prove pretext "by demonstrating the defendant acted contrary to a written company policy, an unwritten company policy, or a company practice when making the adverse employment decision affecting the plaintiff." *DePaula*, 859 F.3d at 971. In this case, Ms. Tastan contends that LANS' policy is to retain employee reprimands for two maximum years. Ms. Tastan did not submit that policy in the record; she instead submitted an e-mail exchange between her and another LANS employee who explained to Ms. Tastan that letters of reprimand are kept for two years. *See* Email from Erylnda M. Martinez to Audrian Tastan (March 15, 2017), Pl.'s Resp. Br., Ex. H.[9] However, LANS did not terminate Ms. Tastan because of the old reprimand. Rather, LANS' stated reason for firing, consistent from when it terminated her to this litigation, is because she engaged in what it considered misconduct.

---

[9] LANS objects that this evidence is inadmissible hearsay and that the employee's statements are not an actual record of LANS' disciplinary policies. The Court does not decide whether the employee's statements reflect LANS' policy or whether the employee was authorized to speak on behalf of LANS, but instead considers this a fact over which there is a genuine dispute. For purposes of deciding the motion for summary judgment, however, the Court views the evidence in the light most favorable to Ms. Tastan and will assume that the employee's statements establish that LANS' policy is to retain letters of reprimand for a maximum of two years.

Ms. Tastan's theory that Mr. Telles "rubber stamped" Mr. Rudolph's report fails for lack of evidence. That concept "refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). Ms. Tastan put forward no evidence from which a jury could infer that Mr. Rudolph was either "biased" or "subordinate" employee to Mr. Telles. Moreover, even if Mr. Rudolph yelled "you don't ask the questions, we do," and never interviewed another purported key witness, Randy Drake, this fails to raise an inference of pretext. *See Estate of Bassatt*, 775 F.3d at 1240 (noting that even if the employer's investigation "conceivably could have been more thorough," no inference of pretext where employer interviewed witnesses and heard plaintiff's account of events).

In sum, Ms. Tastan has failed to carry her burden of proof, by a preponderance of the evidence, to show that LANS' termination decision was "factually false" – she admitted to not disclosing her brother's identity – or that "discrimination was a primary factor in the employer's decision." *Foster*, 830 F.3d at 1194. The Court awards summary judgment to LANS on Ms. Tastan's ADA discrimination claim.

### C. Claim for Retaliation

The ADA's retaliation statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Foster*, 830 F.3d at 1186 (quoting 42 U.S.C. § 12203(a)). "A plaintiff establishes a prima facie case of retaliation by showing: (1) he or she engaged in protected opposition to discrimination; (2) he or she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the

adverse action." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000). "As with claims for discriminatory discharge, if the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action." *Selekne*, 248 F.3d at 1264. "If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action is pretextual, i.e. unworthy of belief." *Id.* (citations and internal quotations omitted). According to Ms. Tastan, she requested, and LANS denied, a reassignment to accommodate her disability, which is a protected activity under the ADA. *See Jones*, 502 F.3d at 1194 (a request for reassignment or reassignment to a vacant position constitutes protected activity under the ADA.). LANS challenges the first and third elements of Ms. Tastan's prima facie case, disputing whether Ms. Tastan engaged in protected activity and any purported protected activity was causally linked to her termination.

LANS is entitled to summary judgment on Ms. Tastan's claim for retaliation under the ADA for two reasons. First, Ms. Tastan's claim fails for the additional reason that she did not engage in protected activity, and thus cannot establish a prima facie case. Second, for the reasons set forth earlier, the record establishes a legitimate, nondiscriminatory reason for Ms. Tastan's termination.

As noted earlier, a request for reassignment or reassignment to a vacant position constitutes protected activity under the ADA. *See Jones*, 502 F.3d at 1194. "[B]efore an employer's duty to provide reasonable accommodations … is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *C.R. England, Inc.* 644 F.3d at 1049. "Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear

that the employee wants assistance *for his or her disability.*" *Id* (citations and quotations omitted) (emphases in original).

No reasonable jury could conclude that Ms. Tastan requested assistance for her disability. Ms. Tastan's first request for reassignment occurred in 2014, and she cited stress, hardship, a hostile working environment, and personality problems. Likewise, in her second request made in February 2015, Ms. Tastan told her manager, Manny Garcia, that the group she was working in was affecting her health, without an expression for assistance for her epilepsy, and requested a reassignment on that ground. In May 2016, Tastan told Ms. Hogan in an email that she wished to be reassigned from the Weapons Division because of "poor management personalities" and a stressful work environment. None of these requests for reassignment gave LANS fair notice that Ms. Tastan was requesting assistance for her disability. Finally, the fact that decisionmakers allegedly knew that Ms. Tastan was epileptic – which Ms. Tastan provides no evidence of – does not transform any of these statements into a request for an accommodation. *See C.R. England, Inc.*, 644 F.3d at 1050 (although employer knew employee was HIV-positive, employee's statements about needing "family time," "home time," and to "see his doctor," did not constitute requests for accommodation because of his HIV status.). The record does not show a single instance of a request by Ms. Tastan requesting a reassignment based on her disability. Thus, even drawing reasonable inferences in Ms. Tastan's favor, no reasonable jury could conclude that Ms. Tastan's statements gave LANS notice that she needed a reassignment to accommodate her epilepsy.

In her response brief, Ms. Tastan provides the following additional evidence that LANS retaliated against her. First, Ms. Tastan contends that in 2015 she was "harassed" when she requested a deviated work schedule and had to sign the MOU that non-disabled employees did not have to sign and that supervisors gave her poor performance reviews. Even crediting these facts as

true, Ms. Tastan provided no evidence whatsoever that the harassment, MOU, or poor performance reviews were because she engaged in protected activity. In support of these allegations, Ms. Tastan simply cites only her own deposition testimony of her subjective beliefs, which amounts to mere conjecture.

Ms. Tastan additionally contends that once she was finally reassigned in 2016 she was subjected to further harassment and hostility. As evidence, she points to Ms. Rodriguez's conduct in ignoring Ms. Tastan's request to secure office space and asking Ms. Tastan if Ms. Tastan "had a problem" with her. In addition, she contends that Mr. Rudolph, the HR investigator, was hostile by slamming the door on Ms. Tastan and yelling "you don't ask the questions we do," when Ms. Tastan asked him a question. Once again, even crediting these allegations as true, Ms. Tastan provided no evidence that any of these actions by LANS were taken because Ms. Tastan expressed assistance for her epilepsy. Ms. Tastan has failed to establish a prima facie case of retaliation under the ADA.

Even if Ms. Tastan established a prima facie case of retaliation, Ms. Tastan's evidence does not create a genuine issue of material fact regarding whether LANS' proffered reason for retaliating against her was pretextual. In attempting to show that LANS' reasons were pretextual, Ms. Tastan relies on the same evidence that she proffered in support of her ADA discrimination arguments. As the above discussion of Ms. Tastan's evidence regarding pretext demonstrates, she has failed to raise a disputed issue as to whether LANS' proffered reason is pretextual. The Court therefore grants LANS summary judgment on Ms. Tastan's retaliation claim.

## III.     CONCLUSION

**IT IS THEREFORE ORDERED that** Defendant Los Alamos National Security LLC.'s Motion for Summary Judgment **[ECF No. 57]** is **GRANTED** and that its Partial Motion for Judgment on the Pleadings **[ECF No. 33]** is **DENIED** as **MOOT**.

**IT IS FURTHER ORDERED that** Plaintiff's claims against Defendant are **DISMISSED** with prejudice.

**IT IS SO ORDERED**

_____
UNITED STATES DISTRICT COURT JUDGE